[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action brought by the plaintiff wife against the defendant husband for dissolution of their marriage on the grounds of irretrievable breakdown. The plaintiff's motion for contempt is also at issue. The matter was first tried to this court in June, 1994. By judgment dated September 19, 1994, the court dissolved the marriage and made certain financial orders. Thereafter, the plaintiff appealed the judgment. On December 16, 1994, the trial court issued an Amended Memorandum of Decision. On February 13, 1996 the Appellate Court reversed the judgment of the trial court as to all orders except the order dissolving the marriage, and remanded the case for a new trial. Standish v.Standish, 40 Conn. App. 298 (1996). A new trial requires the court to consider all financial matters and the issues between the parties as they are at the time of the new trial. See. Michelv. Michel, 31 Conn. App. 338, 341 (1993).
At trial, the parties testified, filed financial affidavits, submitted written proposed claims for relief, and introduced a large number of documentary materials, primarily financial, into evidence.
The parties made reference to financial affidavits filed by them at the June, 1994 trial, which were part of the court file. In addition, the plaintiff called a trust officer from Fleet Bank as a witness. Through counsel, the parties submitted briefs on the legal issues presented. The court observed the demeanor of the parties on the stand and assessed their credibility.
 I.
Based upon the evidence, the court finds the following facts. The parties were intermarried at Cheshire, Connecticut on September 2, 1959. They had three children issue of the marriage, who are now 34, 32, and 30 years of age. The court has jurisdiction. CT Page 13522
The plaintiff, Mrs. Standish holds a bachelor s and a master s degree, and undertook additional graduate studies in the 1970's. She was employed as a school teacher during the early years of the marriage, but gave up that career to raise the parties' children. She has not worked in the field of education for more than thirty years, and is not licensed or certified as a teacher in Connecticut. Prior to the institution of the dissolution action, she took up gardening work at relatively insignificant wages, but her age and physical condition would not permit her to continue such work. Throughout the marriage, she was an active participant in her children's activities and in community and volunteer work.
Now sixty five years old, the plaintiff has worked in retail sales since the commencement of this action. She presently earns $159 to $189 per week from that employment, based upon an hourly rate of $10. She recently reduced to less than twenty the number of hours she had been working per week to make herself eligible for social security retirement benefits, and beginning in November will receive her first monthly check of $594. Her earnings and earning capacity is $175 per week, in addition to her social security income of $137 per week.
In 1978, the plaintiff was given a half interest in a shore cottage in Branford by her parents, and she inherited the remaining interest in the property upon her mother's death in 1995, after the first trial. The property has a value of $475,000, but is encumbered by a mortgage of $119,471 placed upon it by the plaintiff and her mother to provide funds for her father s convalescent care prior to his death. The equity in the property is $355,529. In addition, she received a gift of $96,000 from her parents prior to the commencement of this action, and since the dissolution of the marriage has inherited an additional $293,000, which is being held in escrow pending the resolution of litigation over her mother's estate. She will not receive less than the $293,000, but may receive more if her challenge to her mother's will is successful. Thus, she has acquired approximately $744,000 in net assets from her parents, most of it since the marriage was dissolved. However, of the $67,120 in debt listed on her financial affidavit, approximately $35,000 is attributable to attorney fees and other costs associated with her mother's estate.
During the marriage and until May, 1997, the defendant worked CT Page 13523 in management positions at various stock brokerage companies. His annual salary went from $158,657 in 1983 to approximately $450,000 in 1989, when the firm for which he worked was severely damaged by a securities scandal not involving the defendant, and he lost his job. His work as a manager for that company was extremely successful. He testified that his efforts had led to an increase of more than $5 million per year in annual revenues over six years for the branch office he managed.
Despite the defendant's nearly two million dollars in earnings over the last six years of the 1980's, the parties did not lead an extravagant life style. Expenses for their home including interest and real estate taxes were never greater than $18,000 per year, according to their tax returns. They paid normal expenses for their children including sums for tuition and activities, and purchased some antiques. However, they did not acquire substantial assets apart from some stocks which will be discussed below. Neither party is able to explain what happened to all the money the defendant earned during those years. The defendant was the primary financial manager for the household, and is in a better position to know. What is clear is that the parties did not make a particular effort to save because they relied on a well-endowed trust established by the defendant's grandmother to see them through their declining years.
In addition to those substantial earnings during the 1980's, the defendant acquired substantial additional cash during the period between 1989 and 1992. In 1989, he liquidated $174,680 in stock, including approximately $120,000 in securities issued by his employer Drexel Burnham Lambert. In 1991, he liquidated additional stocks for the approximate sum of $155,000. Beginning in 1989, he drew down nearly all of the $100,000 equity mortgage on the marital residence, having drawn a modest portion of the total earlier. In 1991, he took a $93,000 early distribution on a retirement plan, and in 1992, after the commencement of this action, took an early distribution of $67,322.12 on an IRA. The defendant did not account for any of the funds realized from these liquidations, but it is clear that the sums would have been part of the marital estate had they been available for distribution at the first trial in 1994 or in the current proceeding. No such sums were included in the defendant's June 27, 1994 financial affidavit, which showed only $1,000 in savings, $42,800 in stock, and $335 in retirement accounts. In addition to these sums, the defendant received $141,000 in gifts from his parents prior to July 27, 1995. Although his June 27, CT Page 13524 1994 financial affidavit showed a "debt" of $95,000 to his parents, that "debt" evidently was liquidated after that date, since his current financial affidavit shows an additional "debt" of $90,000 to his mother incurred during 1995 and 1996, but makes no reference to the earlier sum.
The defendant possesses a vested interest in one half of a testamentary trust established for his benefit and the benefit of his brother, Welles Standish, II, equally, under the will of his grandmother, Nettye Standish, who died in 1966. The Nettye Standish Trust includes the following pertinent provisions:
1. The Trustee was to hold the principal of the trust during the life of the defendant's father, Welles Standish, and to pay him the net income after trust expenses for life. Dr. Standish died in 1997.
2. Upon Dr. Standish's death, the Trustee is required to hold and manage the principal of the trust during the life of his widow, the defendant's mother, Rosamind Standish, and to pay her the net income after trust expenses for life. Mrs. Standish is stilI living, and is 94 years old.
3. The trustee, in its sole discretion, has the authority to invade the principal of the trust for Mrs. Standish's comfortable maintenance. The Trustee has not exercised this power in the thirty two years the trust has been in existence.
4. Upon the death of Rosamind Standish, the trust passes to the defendant and his brother in equal shares, absolutely and free of trust. If either of them is not living at her death, his share passes to his issue.
5. No life beneficiary or remainderman has the power to anticipate proceeds or the power to appoint.
The present value of the trust is $2,007,000, and the present value of the defendant's vested share is therefore $1,003,500, according to Robert Bolgard, Trust Officer for Fleet Bank, the trustee. Mr. Bolgard testified and the court finds that the defendant will receive his share of the Nettye Standish Trust free of estate taxes.
The defendant is also a beneficiary of a testamentary trust established by his father. The Welles Standish trust originally CT Page 13525 possessed principal of approximately three quarters of a million dollars, but that amount has been diminished since Dr. Standish's death in May of 1997, and the current value of the trust is $676,355.58. The trust is divided into two portions, a marital trust and a residuary trust. The residuary trust consists of the first $625,000, and the marital trust contains the balance of principal at inception. With respect to the marital portion, the Trustee is required to pay Rosamind Standish, the defendant's mother, its income for life, and she or the trustee may invade principal for her "most comfortable maintenance and support." With respect to the residuary portion, the trustee may pay Rosamind Standish income or principal, or, subject to her needs, may pay income or principal to the defendant or his brother, such advances being deducted from whatever each will receive at the termination of the trust. The existence of the Welles Standish trust and its provisions for Rosamind Standish's benefit make it unlikely that the Trustee of the Nettye Standish Trust will need to invade its principal to provide for the elder Mrs. Standish.
In early 1997, the defendant was terminated from his job at a brokerage firm for lack of productivity, which he testified was brought about in part by his unhappiness with the position. Although he has not been employed since then, and receives only social security retirement income of $284 per week, he testified that he has not seriously looked for work during that period because of his family's request that he remain available to assist his mother. During the years between 1992 and his retirement, his earnings diminished but were still substantial. In 1992, he earned $122,553, working at two brokerage firms. In 1993, he earned $118,731. In 1995, he earned $81,291, and in 1996 he earned $24,604. In addition, he has received other sums from his family. In 1997, he inherited $19,575 from an aunt and received $40,000 in gifts from his parents. He has received between $3,000 and $4,600 monthly from his mother in 1998. To receive these funds, according to his testimony, he has only to ask for them.
The defendant bears the primary fault for the breakup of the marriage. He had several affairs during the marriage, but the most recent was the principal cause of the dissolution. The plaintiff learned of that affair when, some months before commencing the action, she accidently discovered intimate correspondence between the defendant and a co-worker of his. Although the defendant was embarrassed and inconvenienced by the plaintiff's poor housekeeping and her intemperate language toward CT Page 13526 and about the defendant, uttered both publicly and privately, neither that conduct nor his embarrassment about it constitutes a significant cause for the dissolution. The court does not find that the parties' abstinence from sexual relations during the twenty four years prior to the commencement of this action was a significant cause of the dissolution, but in any event finds that the defendant was more responsible than the plaintiff for the cessation of those relations.
The court finds that the defendant's testimony concerning financial matters was without credibility. His testimony, for example, that he did not know what happened to most of the nearly $100,000 he drew down on the home equity loan does not square with his enormous success as a manager in the financial industry. His current financial affidavit attributes to his antiques a value of only $20,000, whereas his 1994 financial affidavit showed the value of such items as $303,000, of which $140,000 were items acquired during the marriage. He did not testify that he had disposed of any antiques except that he and the plaintiff had mutually divided some of them, each taking about sixty-five items. The plaintiff's testimony that the defendant had retained the more valuable Standish family heirlooms and antiques, including a clock valued in excess of $60,000, was not challenged. The court finds that the value of the defendant's antiques is in excess of $60,000, and based on a comparison of the defendant's June 27, 1994 financial affidavit and the testimony and financial affidavit in this proceeding is more likely than not in excess of $150,000.
The parties have divided their personal property by agreement, including the antiques. The marital home was sold. After payment of the first mortgage and the $100,000 line of credit, the sale of the home netted $84,000, of which the plaintiff has received $42,000 by agreement and $42,603 is being held in escrow, subject to an interpleader action in federal court in which the defendant, the Internal Revenue Service (IRS), and the escrow agent have asserted claims to the funds. The IRS's claim to the funds relates to its claim against the defendant for back taxes.
 II.
In addition to the claims of the plaintiff for alimony, counsel fees, and equitable distribution of the parties' estate pursuant to Section 46b-81 of the Connecticut General Statutes, CT Page 13527 and the claims made by the parties in their proposed orders, this matter requires the resolution of three additional legal issues, as follows:
 A. do the trusts, or either of them, of which the defendant is a beneficiary constitute a part of his estate subject to orders concerning alimony and/or property distribution;
 B. does the defendant's regular receipt of funds from his parents constitute income which can be included in the calculation of any alimony order;
 C. were the defendant's payments on the first mortgage, the equity line, and for property taxes during the period prior to the resolution of the appeal when he was obligated to pay alimony attributable to the satisfaction of the alimony order?
 A.
Before deciding whether to distribute either or both of the trusts of which the defendant is the beneficiary between the parties, the court must first determine whether they constitute property which is part of the defendant's estate subject to distribution under Section 46b-81 of the General Statutes and, if so, their value. Krafick v. Krafick, 234 Conn. 783, 792-93
(1995). The court has valued the defendant's interest in the Nettye Standish Trust as $1,003,500. The value of the defendant's interest in the Welles Standish Trust is less certain because of the powers of the three beneficiaries to invade principal, and because there is insufficient evidence to determine the extent to which the defendant's expected share has already been diminished.
It is clear that the court cannot distribute the proceeds of a trust if it is a mere expectancy.
 "Expectancy" is the bare hope of succession to the property of another, such as may be maintained by an heir apparent. Such a hope is inchoate. It has no attribute of property, and the interest to which it relates is at the time nonexistent and may never exist.
Rubin v. Rubin, 204 Conn. 224, 229-30 (1987). It is therefore necessary to determine whether either or both of the subject trusts constitute mere expectancies, or whether they have the CT Page 13528 attributes of property. "The terms `estate' and `property' as used in the statute (46b-81) connote presently existing interests. `Property' entails `interests that a person has already acquired in specific benefits." Id., 230-231.
In Rubin, the Supreme Court overturned a trial court decision awarding the wife a share of assets the husband might acquire under his mother's will or on the termination in his favor of a revocable intervivos trust created by her. The court considered both assets to be mere expectancies. There, the husband's mother had the power so long as she was alive to exclude her son from her will and to revoke the trust she had established for his benefit.
However, the fact that property has not yet come into the control of an individual does not in itself require a conclusion that the property comprises a mere expectancy. The court must consider, for the purposes of modification of alimony, an inheritance received by a party after an original alimony award where the assets had been vested in him but he had not yet received them. Bartlett v. Bartlett, 220 Conn. 372 (1991); also, see, Eslami v. Eslami. 218 Conn. 801 (1991) (appropriate for the court to consider an asset that has vested but not yet been received). Future benefits to be received by a party to a dissolution action for a specific indemnity award under the worker's compensation statute are property subject to distribution under Section 46b-81 of the General Statutes even where the amount of those benefits had not been determined at the time of dissolution. Tyc v. Tyc, 40 Conn. App. 562, 568-69
(1996). Similarly, vested pension benefits not yet subject to access by an individual constitutes property subject to distribution under 46b-81.
. . . vested pension benefits represent an employees right to receive payment in the future, subject ordinarily to his or her living until the age of retirement. "The fact that a contractual right is contingent upon future events does not degrade that right to an expectancy."
Krafick v. Krafick, 234 Conn. 783, 797 (1995).
The definition of property for purposes of Section 46b-81 of the General Statutes is broad and comprehensive, consistent with the purpose of the equitable division statute. Id., 795. The term is "used to denote everything which is the subject of ownership, CT Page 13529 corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal; everything that has an exchangeable value or which goes to make up wealth or estate. It extends to every species of valuable right and interest, and includes real and personal property, easements, franchises, and incorporeal hereditaments." Id., 794.
There are a number of ways that trusts can be created, see, e.g., Bogert, The Law of Trusts and Trustees, Vol. II, § 182, pp. 266-257, and a determination of whether a trust constitutes property requires an analysis of the trust itself. Here, the trust vested in the defendant thirty-two years ago, subject only to his surviving the life tenant. In such a case, the trust is vested, subject to divestiture on his failure to survive. See,id., section 182, pp. 390-394, citing Bronson v. Pinney,130 Conn. 262 (1943); McFarland v. Chase Manhattan Bank,32 Conn. Sup. 20, aff'd. 168 Conn. 411 (1975).
The court concludes that the defendant's interest in the Nettye Standish Trust constitutes property subject to distribution in this action in accordance with the criteria set forth in Section 46b-81 of the General Statutes. His rights to the inheritance vested in 1966, when the trust was established. The present value of that interest can be determined. The principal has never been invaded, and is unlikely to be. The only contingency that would prevent his receipt of the property would be his failure to survive his mother. That contingency does not convert his vested contingent remainder interest from property to a mere expectancy. See, Krafick v. Krafick, 234 Conn. 783. 797 (1995), also see, Mahoney v. Mahoney, 98 Conn. 525 (1923). The court concludes, however, that the defendant's interest in the Welles Standish Trust cannot be considered for distribution under46b-81 in this action. There is insufficient evidence from which to value that asset, even if it does constitute a part of the defendant's estate.
In reaching this conclusion, the court is conscious of the teaching of Rubin that the award of a portion of property from a party who has not yet obtained the asset to his spouse may prove illusory. Rubin v. Rubin, 204 Conn. 224, 234 (1987). Indeed, if the defendant does not survive his mother, he will not receive the asset, and the plaintiff may have no recourse. Under the facts and circumstances of this case, however, it would be inequitable for the court to deny to the plaintiff an opportunity to share this asset with her former husband. Without the trust, CT Page 13530 the defendant shows assets of only $30,500 on his current financial affidavit, although the court has determined that those assets are understated by at least $40,000 with respect to his valuation of antiques he owns. That amount would be insufficient to award the plaintiff an equitable share of the marital estate under the criteria set forth in Section 46b-81 of the General Statutes, particularly in view of the fact that the parties did not save for their declining years during their long marriage in reliance on existence of the Nettye Standish Trust.
Because the defendant receives no current income from the Nettye Standish Trust, the court will not take it into account in ordering current periodic alimony pursuant to Section 46b-82 of the Connecticut General Statutes. However, alimony will be modifiable, and the principal or income from the trust may be a factor a future court will consider in determining whether a modification is warranted once the defendant has actual possession of the asset.
 B.
The plaintiff asserts that the court should consider the funds that the defendant has regularly received from his parents in fashioning an award of periodic alimony. The defendant received $141,000 from his parents prior to July 27, 1995, $40,000 in 1997, and between $3,000 and $4,600 per month in 1998. While the defendant's financial affidavit lists a $90,000 debt to his mother incurred during 1995 and 1996, there is no evidence that he executed a note or that he is expected to repay the sum. Moreover, the terms of the Welles Standish Trust make clear that sums he receives from his mother are advances on his expected inheritance under that trust. "At least where the past gratuities have been made on a regular basis during the marriage . . . the court may reasonably assume that those contributions will continue." Rubin v. Rubin, 204 Conn. 224, 238-9 (1987).
"[R]egularly and consistently received gifts . . . are properly considered in determining alimony awards to the extent they increase the amount of income available for support purposes." Unkelbach v. McNary, 244 Conn. 350, 360-1 (1998). Should they terminate, the award may be modified. Id., at 361. Accordingly, the defendant s regular receipt of sums from his family will be considered in determining any award of alimony to the plaintiff. CT Page 13531
 C.
The defendant asserts that he should be given credit with respect to an alimony arrearage for amounts he paid on the plaintiff's behalf during the pendency of the appeal, at a time when he had an obligation to pay the plaintiff $500 per week. The total due for alimony during that period was $36,500. The defendant made payments of $3,908.09 to West Hartford for real estate taxes on the marital home, $9,842.82 to Shawmut/Fleet Bank interest on the $100,000 equity line, and $4,744.85 to American Savings Bank for payments on the first mortgage. He also claims to have made payments of $10,988 directly to the plaintiff, but acknowledges that $500 of that total was meant as a gift. In addition, he made payments of $3,274.07 to Fleet Bank, $946.17 to American Savings Bank, and $500 directly to the plaintiff after February 13, 1996.
The purpose of alimony is to meet one's duty of support.Weiman v. Weiman, 188 Conn. 232, 234 (1982). "Alimony is always represented by money and is damages to compensate for loss of marital support and maintenance." Crowley v. Crowley,46 Conn. App. 87, 98 (1997). In general, the dignity and independence of the recipient of alimony is enhanced by the direct receipt of the funds, and diminished when the obligor undertakes to make payments on the recipient's behalf to third parties. Here, the plaintiff was entitled under the judgment of the court to receive $500 per week, to spend as she might choose.
The defendant's reliance on cases where in-kind payments for mortgage. insurance. and similar expenses were upheld is misplaced. Those cases involved pendente lite orders, whereas in this case the orders for periodic alimony were part of a final judgment. The purposes of pendente lite awards and final orders are different. Wolk v. Wolk, 191 Conn. 328, 331 (1983). In addition, the court's order in the Wolk case required the husband to make mortgage payments as part of the pendente lite support orders, not in lieu of them.
The defendant's payments to Shawmut for the equity line, to American Savings Bank for the first mortgage, and to the Town of West Hartford for real estate taxes must be analyzed in light of the facts surrounding those payments, including the court orders in existence. With respect to the Shawmut payments, the defendant alone had access to the nearly $100,000 that had been drawn down on that account. In effect, he was paying interest for money only CT Page 13532 he had used. In addition, the court's Amended Memorandum of Decision dated December 16, 1994 required him to maintain the marital home, to pay the home equity loan, and to pay the real estate taxes. Finally, under both the September 19, 1994 judgment and the December 16, 1994 amended judgment. he was to receive a benefit from the sale of the house. Under the circumstances, his dual claim that he made payments to Shawmut and the Town of West Hartford voluntarily and for the benefit of Mrs. Standish is not credible or viable. For these reasons, the defendant cannot sustain his burden of proving his claimed defenses of waiver, laches, or estoppel. However, the court will credit him with payments made on account of the first mortgage, since under the amended judgment Mrs. Standish was responsible for those payments.
Accordingly, the court finds that the defendant is in contempt of the orders of the court for his failure and refusal to make payments of alimony during the pendency of the appeal, and finds that his contempt was willful. The court finds that the defendant is in arrears in the amount of $21,167.15.
The defendant shall pay the plaintiff that sum, together with interest at the statutory rate, within sixty days hereof. This order is in addition to any other orders which will be entered in this case.
 III.
The court has considered all of the evidence and its findings in the light of the criteria set forth in Sections 46b-62,46b-81, and 46b-82 and the relevant case law.
The court orders:
1. The defendant husband shall pay the plaintiff wife the sum of $400 per week as periodic alimony. Alimony shall not terminate except upon the death or remarriage of the wife. Alimony shall be non-modifiable as to duration, but shall be subject to modification during its terms including when the parties receive the assets of the Nettye Standish Trust.
2. The defendant shall be responsible for the payment of any tax liabilities set forth on his financial affidavit, as well as any tax liabilities he may have incurred between 1994 and the date hereof, and shall indemnify and save the plaintiff harmless CT Page 13533 on account of them.
3. The plaintiff wife shall receive the entire amount of $42,603 proceeds from the sale of the marital home that is presently being held in escrow. The defendant shall cause the same to be released to the plaintiff within thirty days hereof.
4. Each party shall pay his or her own attorney fees.
5. The plaintiff shall receive as property distribution one quarter of the defendant's interest in the Nettye Standish Trust, payable within thirty days of the defendant's receipt of the trust assets.
6. Each party shall retain his or her own IRA or 401k accounts.
7. Each party shall be responsible for the debts which appear on his or her respective financial affidavits, and shall indemnify and hold the other harmless with respect to those debts.
8. Each party shall maintain his or her own health, life, casualty, automobile and other insurance.
Orders shall enter accordingly
BY THE COURT,
GRUENDEL, J